UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


ARANTZA CASTRO,                                              CASE NO.

      Plaintiff,

vs.

MATERNITY IP HOLDINGS LP, a Foreign Limited
Partnership D/B/A DESTINATION MATERNITY

      Defendant.

_____/

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF, AND JURY TRIAL DEMAND**

Plaintiff, ARANTZA CASTRO, through undersigned counsel, sues Defendant, MATERNITY IP HOLDINGS LP, a foreign limited partnership d/b/a DESTINATION MATERNITY (hereinafter referred to as "DESTINATION MATERNITY"), for declaratory and injunctive relief, and damages, and alleges as follows:

This action is brought under Title III of the Americans with Disabilities Act ("ADA"), that is codified in 42 U.S.C. §§12181-12189.

1)      This action is also brought pursuant to 28 C.F.R. Part 36.

2)      This Court has jurisdiction over this case based on federal question jurisdiction, as provided in 28 U.S.C. §1331 and the provisions of the ADA.

3)      Furthermore, because this Court has jurisdiction over the ADA claim, the Court has supplementary jurisdiction over Plaintiff's common law tort claim pursuant to 28 U.S.C. §1367.

4)      Plaintiff is sui juris, and she is disabled as defined by the ADA and ADA Amendments Act of 2008, 42 U.S.C. §12101 ("ADAAA").

5)      Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

6)      Plaintiff desires to prevent discrimination and demands equal access to Defendant's internet website to purchase a dress.

7)      Plaintiff also seeks declaratory and injunctive relief for trespass against the Plaintiff's computer.  The computer is Plaintiff's personal property, and a claim for trespass attached to same.

8)      The Defendant is also liable for compensatory damages to Plaintiff as a result of the trespass to Plaintiff's personal property.

9)      The remedies provided under common law for trespass are not exclusive, and same may be sought in connection with suits brought under the ADA.

10)     Venue is proper in the Southern District of Florida, Miami-Dade Division, since all events, actions, injuries, and damages complained of herein occurred in the Southern District of Florida.

11)     Furthermore, Plaintiff is a resident of Miami-Dade County which falls within the Miami Division of the Southern District of Florida.

12)     At all relevant times, Plaintiff is and was visually impaired and has Leber Congenital Amaurosis since birth that substantially impairs Plaintiff's vision whereby her vision fluctuates from 20/250 to 20/800.

13)     Plaintiff's visual impairment interferes with her day-to-day activities and causes limitations in visualizing her environment.  As such, Plaintiff is a member of a protected class under the ADA, 42 U.S.C. § 12102(1) - (2), the regulations implementing the ADA set forth at 28 CFR §§ 36.101, et seq., and in 42 U.S.C. 3602, §802(h).

14)     In addition, Plaintiff is an advocate of the rights of similarly situated disabled persons. As such is a "tester" for the purposes of asserting her civil rights and monitoring, ensuring, and determining whether places of public accommodation and/or their respective and associated

websites are in compliance with the ADA and any other applicable disability laws, regulations, and ordinances.

15)     Plaintiff is limited in the performance of major life activities due to her visual disability and she requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with her use of a computer.

16)     Plaintiff uses the computer regularly, but due to her visual disability, Plaintiff cannot use her computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. In order to assist her, Plaintiff uses NVDA screen reader software that is readily available commercially. As background, screen reader software translates the visual internet into an auditory equivalent.  The software reads the content of a webpage to the user at a rapid pace.

17)     "The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard." *Andrews v. Blick Art Materials, LLC, 17-CV-767, 2017 WL 6542466, at \*6-7 (E.D.N.Y. Dec. 21, 2017).*

18)     Plaintiff frequently accesses the internet. Because she is significantly and permanently visually disabled, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, Plaintiff uses commercially available screen reader software to interface with the various websites.

19)     Defendant, DESTINATION MATERNITY, is a foreign limited partnership authorized to do business and doing business in the State of Florida.

20)     Defendant, DESTINATION MATERNITY, is a company that sells maternity and women clothing, and intimates. There is a retail location in Miami-Dade County.

21)     At all times material hereto, Defendant was and still is a private entity which owns and operates retail locations under the brand name "DESTINATION MATERNITY".  The stores are open to the public, and each of Defendant's locations is defined as a "public accommodation" within the meaning of Title III of the ADA because Defendant is a private entity which owns and/or operates "[A] bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment," per 42 U.S.C. §12181(7)(E) and 28 C.F.R. §36.104(2).

22)     Because Defendant is a store open to the public, each of Defendant's physical stores is a place of public accommodation subject to the requirements of the ADA, 42 U.S.C. §12182, §12181(7)(B), and its implementing regulations, 28 C.F.R. Part 36.

23)     At all times material hereto, Defendant was and still is an organization owning and operating the website located at https://destinationmaternity.com/. Since the website is open through the internet to the public as an extension of the retail stores, by this nexus the website is an intangible service, privilege and advantage of Defendant's brick and mortar locations, the Defendant has subjected itself and the associated website it created and maintains to the requirements of the ADA. The website also services Defendant's physical stores by providing

4

information on its brand and other information that Defendant is interested in communicating to its customers about its physical locations.

24)     Since the website allows the public the ability to view the products available at Defendant's locations, purchase products, through Defendant's website, subscribe to Defendant's newsletter, create an account and register to track orders, create a wish list, and learn the story behind Defendant's brand, the website is an extension of, and gateway to, Defendant's physical stores which are places of public accommodation pursuant to 42 U.S.C. § 12181(7)(E). By this nexus between Defendant's retail store locations and the Website, and the fact that the Website clearly provides support for and is connected to Defendant's stores for its operation and use, the Website is an intangible service, privilege, and advantage of Defendant's brick-and-mortar stores that must comply with all requirements of the ADA.  The Website must not discriminate against individuals with disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as afforded the non-visually disabled public both online and in the physical stores, which are places of public accommodations subject to the requirements of the ADA.

25)     Plaintiff sought to, seeks to and intends to patronize, in the near future once the Website's access barriers are removed or remedied, one or more of Defendant's physical retail locations, check store hours and product pricing and place online orders. In the alternative, Plaintiff intends to monitor the Website in the near future as a tester to ascertain whether it has been remedied and updated to interact properly with screen reader software.

26)     Traveling outside of her home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience, thus the opportunity to shop and pre-shop Defendant's products, plan her visits, and to compare products, services, prices, sales,

discounts, and promotions are important and necessary accommodations for Plaintiff because Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually disabled individuals using screen reader software.

27)      During the month of August 2024, Plaintiff attempted on a number of occasions to utilize the Website to browse through the merchandise and online offers to educate herself as to the merchandise, sales, discounts, and promotions being offered, learn about the brick-and-mortar location, check store hours, and check product pricing with the intent to make a purchase through the Website or in one of the physical locations and with the intent to make a purchase through the website or at one of Defendant's physical stores.  Plaintiff also attempted to access and utilize the Website in her capacity as a tester to determine whether it was accessible to blind and visually disabled persons such as herself who use screen reader software to access and navigate company websites.

28)      Plaintiff utilized NVDA ("Screen Reader Software") that allows individuals who are blind and visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software. Plaintiff attempted to purchase clothing on Defendant's website.  However, the Plaintiff was not able to freely and fully use Defendant's website because it contains access barriers that make it inaccessible to persons with disabilities, and for which there is no reasonable accommodation for the Plaintiff.

29)      Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software. These barriers are pervasive and include, but are not limited to:

**Destination Maternity**   https://www.destinationmaternity.com/

System settings while doing the review:

Operating system: Windows 11

Browser: Google Chrome v. 126.0.6478.183

Screen Reader: NVDA v. 2024.2

Video Recorder: OBS Studio 30.2.2

**Barriers**

- User cannot operate the filters and sort menus.

- User cannot navigate the site in a meaningful way.

- User is not provided bypass mechanisms.

- User cannot operate the Sign In form.

- User cannot checkout.

**Violation 1: 2.1.1 Keyboard**

All functionality of the content is operable through a keyboard interface without requiring specific timings for individual keystrokes, except where the underlying function requires input that depends on the path of the user's movement and not just the endpoints.

When the user navigates to the home page, the first three links in the main navigation menu and also the skip to main content button cannot be operated using a keyboard.

Moreover, the skip to main content button is not visible.

Applicable WCAG 2.1 Standard at Issue: 2.1.1 Keyboard (Level A)

URL Where Issue Was Encountered:

https://destinationmaternity.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/Ed1BMUmhwyZPnj69ju3D8gABCTrcnQKz0
6d6w4q3uYsC1g


**Violation 2: 1.4.3 Contrast (Minimum)**

The visual presentation of text and images of text has a contrast ratio of at least 4.5:1,
except for the following: Large Text: Large-scale text and images of large-scale text have
a contrast ratio of at least 3:1; Incidental: Text or images of text that are part of an
inactive user interface component, that are pure decoration, that are not visible to anyone,
or that are part of a picture that contains significant other visual content, have no contrast
requirement.

In the home page, the contrast ratio of texts and background colors or images is below the
minimum contrast ratio.

Applicable WCAG 2.1 Standard at Issue: 1.4.3 Contrast (Minimum) (Level AA)

URL Where Issue Was Encountered:

https://destinationmaternity.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EaCazWi4jXNMj9XOs6YPcRQB-
EoKIXMpvZRjGlCmvMbmrw


**Violation 3: 2.1.1 Keyboard**

All functionality of the content is operable through a keyboard interface without requiring specific timings for individual keystrokes, except where the underlying function requires input that depends on the path of the user's movement and not just the endpoints.

When the user navigates the search results page, the list items in the Sort By list cannot be operated using a keyboard. The user cannot operate this filter.

Applicable WCAG 2.1 Standard at Issue: 2.1.1 Keyboard (Level A)

URL Where Issue Was Encountered:

https://destinationmaternity.com/search?filter.v.price.gte=10&filter.v.price.lte=&sort_by=relevance&type=product&options%5Bprefix%5D=last&q=dress

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/ESJU0vHyLHlIiSUnpbtAe1gBEkuno05CVMjVqxzPo1dMdA

**Violation 4: 2.4.7 Focus Visible**

Any keyboard operable user interface has a mode of operation where the keyboard focus indicator is visible.

The filters Bottoms and Dresses have no keyboard focus indicator.

Applicable WCAG 2.1 Standard at Issue: 2.4.7 Focus Visible (Level AA)

URL Where Issue Was Encountered:

https://destinationmaternity.com/search?filter.v.price.gte=10&filter.v.price.lte=&sort_by=relevance&type=product&options%5Bprefix%5D=last&q=dress

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EfyjUY-

8wtBLgalPW4WjMtYBRzmzDyTj7PXgnUP4YMDOwQ


**Violation 5: 1.3.2 Meaningful Sequence**

When the sequence in which content is presented affects its meaning, a correct reading

sequence can be programmatically determined.

When the user operates the carrousel, the user is allowed to select an item (far right) that

is not visible. The item only becomes visible when the user navigates to the next item.

The meaningful sequence is not preserved.

Applicable WCAG 2.1 Standard at Issue: 1.3.2 Meaningful Sequence (Level A)

URL Where Issue Was Encountered:

https://destinationmaternity.com/products/split-neck-tiered-

dress?variant=45442866250050

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EdfB92hJwlBCg9DdvTFW0-

gBHHN7onVfspyYsprWlGWEzg


**Violation 6: 2.4.1 Bypass Blocks**

A mechanism is available to bypass blocks of content that are repeated on multiple Web

pages

When the user navigates to the carousel containing other products' images and then to the

footer, there are no any bypass mechanisms offered to the user to skip them and get back

to the main content of the page.

Applicable WCAG 2.1 Standard at Issue: 2.4.1 Bypass Blocks (Level A)

URL Where Issue Was Encountered:

https://destinationmaternity.com/products/split-neck-tiered-

dress?variant=45442866250050

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EZAsgB9C_b9DuSI2TrIlkjgBmrDEYBOJNV

md7CukUTKiEQ


**Violation 7: 2.4.3 Focus Order**

If a Web page can be navigated sequentially and the navigation sequences affect meaning

or operation, focusable components receive focus in an order that preserves meaning and

operability.

While the user navigates the footer, after the user tabs out of the instagram link, focus is

given to the search input box located at the top of the page instead of the other links and

buttons in the footer. Then, when the user tabs out of the filter input box, focus is given

back to elements at the bottom of the page. The focus order cannot be navigated in

sequential order to preserve operability.

Applicable WCAG 2.1 Standard at Issue: 2.4.3 Focus Order (Level A)

URL Where Issue Was Encountered:

https://destinationmaternity.com/products/split-neck-tiered-

dress?variant=45442866250050

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/Eem4FjLiwQJMqKaMzNL5U7EBwMX2GyB
yTdtdO_P_3SfKbQ

**Violation 8: 2.1.1 Keyboard**

All functionality of the content is operable through a keyboard interface without requiring
specific timings for individual keystrokes, except where the underlying function requires
input that depends on the path of the user's movement and not just the endpoints.

The user cannot operate the image slider (containig images of the product) using a
keyboard.

Applicable WCAG 2.1 Standard at Issue: 2.1.1 Keyboard (Level A)

URL Where Issue Was Encountered:

https://destinationmaternity.com/products/split-neck-tiered-
dress?variant=45442866250050

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EX36f6agEUVLnJpx3weEnGUBY4cqCISCz
B62msN5T-wjAQ

**Violation 9: 2.4.4 Link Purpose**

The purpose of each link can be determined from the link text alone or from the link text
together with its programmatically determined link context, except where the purpose of
the link would be ambiguous to users in general.

When the user operates the Shop Now Button, the user is taken to another website, walmart.com. There is no message to inform the user that clicking the button will result in a redirect to another website.

Applicable WCAG 2.1 Standard at Issue: 2.4.4 Link Purpose (Level A)

URL Where Issue Was Encountered:

https://destinationmaternity.com/products/split-neck-tiered-dress?variant=45442866250050

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EdeQk86Zpd9Bot1rjhOuRRMBkH50KFzRwtWYsmOirK2PVw


**Violation 10: 1.1.1 Non-text Content**

All non-text content that is presented to the user has a text alternative that serves the equivalent purpose, except for the situations listed below. Controls, Input If non-text content is a control or accepts user input, then it has a name that describes its purpose. (Refer to Success Criterion 4.1.2 for additional requirements for controls and content that accepts user input.) Time-Based Media If non-text content is time-based media, then text alternatives at least provide descriptive identification of the non-text content. (Refer to Guideline 1.2 for additional requirements for media.) Test If non-text content is a test or exercise that would be invalid if presented in text, then text alternatives at least provide descriptive identification of the non-text content. Sensory If non-text content is primarily intended to create a specific sensory experience, then text alternatives at least provide descriptive identification of the non-text content. CAPTCHA If the purpose of non-text

content is to confirm that content is being accessed by a person rather than a computer, then text alternatives that identify and describe the purpose of the non-text content are provided, and alternative forms of CAPTCHA using output modes for different types of sensory perception are provided to accommodate different disabilities. Decoration, Formatting, Invisible If non-text content is pure decoration, is used only for visual formatting, or is not presented to users, then it is implemented in a way that it can be ignored by assistive technology.

The Product Type, Price and Color buttons have no alternate descriptions of what they do. A user using a screen reader cannot infer what the purpose of each button is.

Applicable WCAG 2.1 Standard at Issue: 1.1.1 Non-text Content (Level A)

URL Where Issue Was Encountered:

https://destinationmaternity.com/search?q=pants&type=product&options%5Bprefix%5D =last

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EdFbpf-z8jdDuhdG2ixj1mIBIoCjy0ZanrH2cD9sKakbCw


**Violation 11: 2.4.7 Focus Visible**

Any keyboard operable user interface has a mode of operation where the keyboard focus indicator is visible.

The items in the Sort By Relevance menu have no keyboard focus indicators.

Applicable WCAG 2.1 Standard at Issue: 2.4.7 Focus Visible (Level AA)

URL Where Issue Was Encountered:

https://destinationmaternity.com/search?q=pants&type=product&options%5Bprefix%5D=last

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/ERSWFvuBUYBNnvRdftSdEL8BkDaIT6YdrTlkUCvLQTuFrA

**Violation 12: 2.1.1 Keyboard**

All functionality of the content is operable through a keyboard interface without requiring specific timings for individual keystrokes, except where the underlying function requires input that depends on the path of the user's movement and not just the endpoints.

The color filters of the products displayed in the search results page cannot be operated using a keyaboard.

Applicable WCAG 2.1 Standard at Issue: 2.1.1 Keyboard (Level A)

URL Where Issue Was Encountered:

https://destinationmaternity.com/search?q=pants&type=product&options%5Bprefix%5D=last

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/ETmhDXHP3thJn3UGLihniZUBJfh_-HQjQixGPMS6uofeog

**Violation 13: 2.4.1 Bypass Blocks**

A mechanism is available to bypass blocks of content that are repeated on multiple Web pages

The user is not offered any bypass mechanisms to skip the Main Navigation menu.

Applicable WCAG 2.1 Standard at Issue: 2.4.1 Bypass Blocks (Level A)

URL Where Issue Was Encountered:

https://destinationmaternity.com/products/seamless-postpartum-compression-bikini?variant=47666730238274

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EVtqob9jKmFIm_ppVlCenMkBZ9822Axbg5K2dbgPrAtnKg

**Violation 14: 2.4.3 Focus Order**

If a Web page can be navigated sequentially and the navigation sequences affect meaning or operation, focusable components receive focus in an order that preserves meaning and operability.

When the user selects on of the color filters, focus is given to the Skip to Main Content link (located at the top of the page) instead of the elements that follow. In this case, it should be the size filter buttons. The focus order cannot be navigated in sequential order to preserve operability.

Applicable WCAG 2.1 Standard at Issue: 2.4.3 Focus Order (Level A)

URL Where Issue Was Encountered:

https://www.walmart.com/ip/Destination-Maternity-Women-s-Cooling-Postpartum-Shaper-Bikini-Panty-Sizes-S-2XL/5047530493

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EXxOigKDGo1AqIkZVLXl0osBwXnzweYw

prn3Q_0s_naRrA


**Violation 15: 2.1.1 Keyboard**

All functionality of the content is operable through a keyboard interface without requiring

specific timings for individual keystrokes, except where the underlying function requires

input that depends on the path of the user's movement and not just the endpoints.

The user cannot operate the Continue to Checkout button using a keyboard. The element

does not receive focus.

Applicable WCAG 2.1 Standard at Issue: 2.1.1 Keyboard (Level A)

URL Where Issue Was Encountered:

https://www.walmart.com/cart

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/Eas8OEzdkr1Pjl7Dzb0R8GMB-

cC_dYRmTYtohURSoYbIcQ


**Violation 16: 3.3.1 Error Identification**

If an input error is automatically detected, the item that is in error is identified and the

error is described to the user in text.

When the user operates the sign in form and enters an invalid whitespace character, there

is no message to inform the user before pressing the Continue button that the value

entered contains invalid characters. In addition, after the button is pressed, a user using a

screen reader cannot identify which invalid characters were entered. The user cannot operate the form.

Applicable WCAG 2.1 Standard at Issue: 3.3.1 Error Identification (Level A)

URL Where Issue Was Encountered:

https://identity.walmart.com/account/login?client_id=5f3fb121-076a-45f6-9587-249f0bc160ff&code_challenge=

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EQ1Y8mgadw9LjylIhHSJvOMBcqZARvjKZ7lS1coq0mY7RQ

30)     Although the Website appeared to have an "accessibility" statement displayed and an "accessibility" widget/plugin added, the "accessibility" statement and widget/plugin, when tested, still could not be effectively accessed by, and continued to be a barrier to, blind and visually disabled persons, including Plaintiff as a completely blind person. Plaintiff, although she attempted to access the statement, thus, was unable to receive any meaningful or prompt assistance through the "accessibility" statement and the widget/plugin to enable her to quickly, fully, and effectively navigate the Website.

31)     The fact that Plaintiff could not communicate with or within the Website left her feeling excluded, as she is unable to participate in the same shopping experience, with the same access to the merchandise, sales, discounts, and promotions, as provided at the Website and in the physical locations as the non-visually disabled public.

32)     Plaintiff desires and intends, in the near future once the Website's access barriers are removed or remedied, to patronize one or more of Defendant's physical stores and to use the Website, but she is presently unable to do so as she is unable to effectively communicate with

Defendant, due to her severe visual disability and the Website's access barriers. Alternatively, as a tester using screen reader software, Plaintiff is unable to effectively access, navigate, and communicate with Defendant through the Website due to her severe visual disability and the Website's access barriers. Thus, Plaintiff, as well as others who are blind and with visual disabilities, will suffer continuous and ongoing harm from Defendant's intentional acts, omissions, policies, and practices as set forth herein unless properly enjoined by this Court.

33)     On information and belief, Defendant has not initiated a Web Accessibility Policy to ensure full and equal use of the Website by individuals with disabilities.

34)     On information and belief, Defendant has not instituted a Web Accessibility Committee to ensure full and equal use of Website by individuals with disabilities.

35)     On information and belief, Defendant has not designated an employee as a Web Accessibility Coordinator to ensure full and equal use of the Website by individuals with disabilities.

36)     On information and belief, Defendant has not instituted a Web Accessibility User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

37)     On information and belief, Defendant has not instituted a User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

38)     On information and belief, Defendant has not instituted a Bug Fix Priority Policy.

39)     On information and belief, Defendant has not instituted an Automated Web Accessibility Testing program.

40)     Defendant has not created and instituted an effective Specialized Customer Assistance line or service or email contact mode for customer assistance for the visually disabled.

41)      Defendant has not created and instituted on the Website a useful or accessible page for individuals with disabilities, nor displayed a link and information hotline, nor created an information portal explaining when and how Defendant will have the Website, applications, and digital assets accessible to the visually disabled or blind community.

42)      The Website does not meet the Web Content Accessibility Guidelines ("WCAG") 2.0 Level AA or higher versions of web accessibility.

43)      Defendant has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals who want the safety and privacy of purchasing Defendant's products offered on the Website and in the physical stores from their homes.

44)      Defendant thus has not provided full and equal access to and enjoyment of the goods, services, facilities, privileges, advantages, and accommodations provided by and through the Website and their physical stores in contravention of the ADA.

45)      Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

46)      The broad mandate of the ADA is to provide an equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet shopping websites such as the Website at issue in the instant action.

47)      Defendant is, and at all relevant times has been, aware of the barriers to effective communication within the Website which prevent individuals with visual disabilities from the means to comprehend information presented therein.

48)     Defendant is, and at all relevant times has been, aware of the need to provide full access to all visitors to the Website.

49)     The barriers that exist on the Website result in discriminatory and unequal treatment of individuals with visual disabilities, including Plaintiff.

50)     Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged hereinabove, and this suit for declaratory judgment and injunctive relief is her only means to secure adequate and complete redress from Defendant's unlawful and discriminatory practices in connection with its website access and operation.

51)     Notice to Defendant is not required because of Defendant's failure to cure the violations.

52)     Enforcement of Plaintiff's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

53)     Plaintiff has retained the undersigned attorneys to represent her in this case and has agreed to pay them a reasonable fee for their services.


**COUNT I – VIOLATION OF THE ADA**

54)     Plaintiff realleges paragraphs 1 through 53 as if set forth fully herein.

55)     Pursuant to 42 U.S.C. §12181(7)(B), Defendant is a public accommodation under the ADA and thus is subject to the ADA.

56)     Pursuant to 42 U.S.C. §12181(7)(B), the Website is covered under the ADA because it provides the general public with the ability to view the products available at Defendant's locations, purchase products through Defendant's website, subscribe to Defendant's newsletter, create an account and register to track orders, create a wish list, and learn the story behind Defendant's brand. The Website thus is an extension of, gateway to, and intangible service, privilege, and

advantage of Defendant's physical locations. Further, the Website also serves to augment Defendant's physical stores by providing the public information about the stores and by educating the public as to Defendant's brand and available products merchandise sold through the Website and in the physical stores.

57)   Under Title III of the ADA, 42 U.S.C. §12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals.

58)   Specifically, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

59)   In addition, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(III), unlawful discrimination includes, among other things, "a failure to take such steps, as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

60)   The Website must comply with the ADA, but it does not as specifically alleged hereinabove and below.

61)     Because of the inaccessibility of the Website, individuals with visual disabilities are denied full and equal access to and enjoyment of the goods, information, and services that Defendant has made available to the public on the Website and in their physical stores in violation of 42 U.S.C. §12101, et seq, and as prohibited by 42 U.S.C. §12182, et seq.

62)     The Website was subsequently visited by Plaintiff's expert in August and the expert determination was that the same access barriers that Plaintiff had initially encountered, as well as numerous additional access barriers, existed. Defendant thus has made insufficient material changes or improvements to the Website to enable its full use and enjoyment by, and accessibility to, blind and visually disabled persons such as Plaintiff. Also, when the Website was visited by the expert, although the Website appeared to have an "accessibility" statement and widget/plugin linked on and displayed from its home page, the "accessibility" statement and widget/plugin, when tested, still could not be effectively used or accessed by, and continued to be a barrier to, blind and visually disabled persons such as Plaintiff. Defendant furthermore has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals, nor has it posted on the Website an effective and useful "accessibility" notice, statement, or policy to provide blind and visually disabled person such as Plaintiff with a viable alternative means to access and navigate the Website. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302. The lack of a viable and effective "accessibility" notice, policy, or statement and the numerous access barriers as set forth in the Declaration of Plaintiff's expert, Mario Saavedra, attached hereto and the contents of which are incorporated

herein by reference, continue to render the Website not fully accessible to users who are blind and visually disabled, including Plaintiff.

63)     More violations may be present on other pages of the Website, which can and will be determined and proven through the discovery process in this case.

64)     There are readily available, well-established guidelines on the internet for making Websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Examples of such guidelines include, but are not limited to, adding alt-text to graphics and ensuring that all functions can be performed using a keyboard. Incorporating such basic components to make the Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to Defendant.

65)     Defendant has violated the ADA -- and continue to violate the ADA -- by denying access to the Website by individuals such as Plaintiff with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Website are ongoing.

66)     The ADA requires that public accommodations and places of public accommodation ensure that communication is effective.

67)     According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems".   Indeed, 28 C.F.R.§36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

68)     According to 28 C.F.R. §36.303(c), public accommodations must furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals

with disabilities: "In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability," 28 C.F.R. §36.303(c)(1)(ii).

69)     Part 36 of Title 28 of the C.F.R. was designed and is implemented to effectuate subtitle A of Title III of the ADA, which prohibits discrimination on the basis of disability by public accommodations, and requires places of public accommodation to be designed, constructed, and altered in compliance with the accessibility standards established by Part 36.

70)     As alleged hereinabove, the Website has not been designed to interface with the widely and readily available technologies that can be used to ensure effective communication, and thus violates the ADA.

71)     As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to their brick-and-mortar stores, Plaintiff has suffered an injury in fact by being denied full access to, enjoyment of, and communication with Defendant's Website and its physical stores.

72)     Because of the inadequate development and administration of the Website, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

73)     Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant Plaintiff appropriate and necessary injunctive relief, including an order to:

i.      Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of the Website to a functional statement as to the Defendant's policy to ensure persons with disabilities have full and

equal access to and enjoyment of the goods, services, facilities, privileges, advantages, and accommodations through the Website and the physical locations.

ii.     Require Defendant to take the necessary steps to make the Website readily accessible to and usable by blind and visually disabled users, and during that time period prior to the Website's being made readily accessible, provide an effective alternative method for individuals with visual disabilities to access the information available on the Website until such time that the requisite modifications are made, and

iii.    Require Defendant to provide the appropriate auxiliary aids such that individuals with visual disabilities will be able to effectively communicate with the Website for purposes of viewing and locating Defendant's stores and becoming informed of and purchasing Defendant's products, and during that time period prior to the Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through the Website and the physical stores.

iv.     Plaintiff is entitled to recover her reasonable attorney's fees, costs, and expenses pursuant to the ADA. To that end, Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action and has agreed to pay them a reasonable fee for their services.

74)     WHEREFORE, Plaintiff requests entry of judgment in her favor and against Defendant for the following relief:

a.      A declaration that Defendant's website is in violation of the ADA;

b.      An Order requiring Defendant, by a date certain, to update its website, and continue to monitor and update its website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, the website and effectively communicate with the website to the full extent required by Title III of the ADA;

c.      An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within its website, wherein the logo [1]would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations.  Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of the website;

d.      An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to insure compliance thereto.

e.      An Order directing Defendant, by a date certain to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to its website;

f.      An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for its website to insure effective communication for individuals who are visually disabled;

---


[1]

g.      An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's website to be fully accessible to the visually disabled;

h.      An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

i.      An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of its website to identify any instances where the website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review.

j.      An Order directing Defendant, by a date certain, to make publicly available and directly link from its website homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of its website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems.

k.      An award to Plaintiff of her reasonable attorney's fees and costs pursuant to in 42 U.S.C. §§12181-12189, and pursuant to such other laws and statutes that may apply, and further relief as the Court deems just and equitable.


**COUNT II – TRESPASS**

Plaintiff realleges paragraphs 1 through 53 as if set forth herein.

75)     Defendant's website contains software analytics.  Since Plaintiff has navigated Defendant's website as stated herein, Plaintiff's computer and the personal information and browsing history stored therein, has suffered a trespass by Defendant.

76)     Plaintiff never consented to and was unaware that Defendant's website was placing software on her computer.

77)     The "pop-up" or banner notice that appears on Defendant's website does not properly audibilize the cookies policy in a way where a visually disabled person like the Plaintiff can properly understand or give informed consent to allow tracking cookies to be placed on her computer.

78)     Defendant committed common law trespass in violation of Florida law against Plaintiff because Plaintiff did not consent to the placement of tracking and information securing software on her personal computer, which was done without her knowledge and consent.

79)     Defendant's trespass has damaged Plaintiff by affecting the condition and value of her computer.

80)     On its website, Defendant has an internet privacy policy section that can only be accessed by clicking a barely visible section at the bottom of the page called "Cookies Policy", providing that they use cookies and similar technologies to collect a consumer's information and they obtain non-public information from their users for their own advertising and marketing purposes by placing software on its website that collects a website user's preferences and internet browsing habits as follows:

INFORMATION WE COLLECT AND HOW WE USE IT

| PERSONAL INFORMATION | SOURCE | PURPOSE | THIRD PARTIES |
|---|---|---|---|
| Personal and online identifiers (such as first and last name, email address, phone number, usernames, or unique online identifiers, including IDFA, AAID) | Directly from you | Customer support Marketing and targeted advertising Security and fraud prevention | Customer service partners Analytics services |
| Communications with you (such as customer support messages, emails) | Directly from You Customer support partners | Customer support | Analytics services Technology service Providers Customer support vendors |
| Online Activity Information (such as browsing history, search history, interactions with a website, email, application, or advertisement) | Directly from You Cookies and similar technologies | Direct marketing Targeted advertising | Technology service providers Analytics services |

|  |  |  | Ad networks |
|---|---|---|---|
|  | Marketing partners Advertising networks Third-party data providers |  |  |
|  |  |  | MARQUEE Ad networks Marketing sponsors Technology service providers Analytics companies |
| Inferences drawn from the above information about your predicted characteristics and preferences | MARQUEE Third-party data providers Marketing sponsors | Personalization of the Site for you Direct marketing Targeted advertising Analytics |  |

We may also use the information we have about you:

as necessary if we believe there has been a breach of the Terms of Use or the rights of any third party, or

to comply with legal and/or regulatory requirements.

We combine information we receive from other sources with information you give to us and information we collect about you. We use this combined information for the purposes set out above.

DISCLOSURE OF PERSONAL INFORMATION

We do share data with third parties, including MARQUEE and the other categories of partners as listed above. Some of these disclosures of data may constitute a "sale" of such data under some data privacy laws. Accordingly, we offer you the option of opting out of the sale of your personal information, as further set forth below.

We may share your personal information with MARQUEE and with selected third parties including:

business partners, suppliers and sub-contractors for the performance of any contract we enter into with them or you in order to provide you with a product or service;

business partners, suppliers and sub-contractors to provide you with information about promotions and offers;

advertisers, advertising networks and social networks that require the data to select and deliver relevant advertisements to you and, in some cases, to others. For more information on how we use personal information for targeted advertising, see below; and analytics and search engine providers that assist us in the improvement and optimization of the services we offer or provide.

We may disclose your personal information to third parties:

If we enter into negotiations to buy, sell, or merge with any business or assets, or if we enter into bankruptcy, reorganization, or receivership, in which case we may disclose your personal information to the prospective or eventual seller or buyer of such business or assets;

if we are under a duty to disclose or share your personal information in order to comply with any legal obligation, or in the event of an emergency, or in order to enforce or apply

our Terms of Use and other agreements, or to protect the rights, property, or safety of Destinationmaternity.com, MARQUEE, our customers, clients, suppliers or others; and to any other third party not covered in this policy with your prior consent.

MARKETING AND ADVERTISING

TARGETED ADVERTISING

We use your personal information to tailor our marketing and advertising efforts. To do this, we provide your information to third-party advertising networks (such as Google Doubleclick) and social media companies (such as Facebook). When we provide data to agencies, ad networks, and other parties for targeted advertising, we do not provide them with your name, financial information, or any sensitive information (such as a government ID or date of birth, if we have collected that). We use online identifiers such as email, cookie addresses, and device identifiers to help us provide targeted advertising to you and others like you. We also may use aggregate information to help advertisers reach the kind of audience they want to target. We may make use of the personal information we have collected from you to enable us to display advertisements to target audiences.

COOKIES, ETC.

As is true of most internet services, we gather some information of your visits to the Site automatically and store it in log files. This information includes Internet Protocol (IP) addresses, browser type and language, Internet service provider (ISP), referring and exit websites and applications, operating system, date/time stamp, and clickstream data. We

use this information to understand and analyze trends, to administer the Site, to learn about user behavior on the Site, to improve our product and services, and to gather demographic information about our user base as a whole. We may use this information in our marketing and advertising services

We and our third-party service providers use cookies and other tracking mechanisms to track information about your use of our Site. We may combine this information with other personal information that we collect from you (and our third-party service providers may do so on our behalf).

Cookies."Cookies" are small data files stored on your own computer's hard drive. We (and our third-party providers) use cookies to facilitate the operation of our Site (for example, as part of the account login and checkout features), to personalize the content we display to you, and for analytics, marketing, and advertising purposes. Most web browsers automatically accept cookies but, if you prefer, you can edit your browser options to block them in the future. The Help portion of the toolbar on most browsers will tell you how to prevent your computer from accepting new cookies, how to have the browser notify you when you receive a new cookie, or how to disable cookies altogether. If you choose to reject cookies, certain functions and applications on our Site may not work properly. We treat information collected by cookies and other technologies as non-personal information. However, to the extent that Internet Protocol (IP) addresses or similar identifiers are considered personal information by local law, we also treat these identifiers as personal information. Similarly, to the extent that non-personal information is combined with personal information, or with any other non-personal information for the purpose of building a profile of an individual, we treat the combined information as

34

personal information for the purposes of this Privacy Policy.

Pixel Tags. Pixel tags (sometimes called web beacons, web bugs or clear GIFs) are tiny graphics with a unique identifier that function similarly to cookies. In contrast to cookies, though, clear GIFs are embedded invisibly on web pages and not stored on your hard drive. We might use clear GIFs to track the activities of users of our Sites, help us manage content, and compile statistics about usage. We and our third-party service providers also might use clear GIFs in HTML e-mails sent to our customers, to help us track e-mail response rates, to identify when our e-mails are viewed, and to track whether our e-mails are forwarded.

Third-Party Analytics. We use automated devices and applications, such as Google Analytics, (for more information, click here) to evaluate usage of our Site, including to determine the popularity of certain content, deliver advertising and content targeted to your interests on our Site and other websites, and to better understand your online or offline activity. We use these tools to help us improve our Site, performance of the Site, and user experiences. These third parties may use cookies and other tracking technologies to perform their services. We do not share your personal information with these third parties. We do not knowingly collect this information from users with EEA (European Economic Area) IP addresses.

81)     Due to Plaintiff's disability, she could not understand Defendant's website and she could not give informed consent to Defendant's installation of data and information tracking software on her computer.  Defendant also could not give informed consent to Defendant's collection of her browsing history and the placement of analytics on her computer.

82)   Thus, Plaintiff has no adequate remedy at law to redress Defendant's knowing and reckless disregard for Plaintiff's right to exclude others from her computer and determine which programs should be installed and operated on her computer.

WHEREFORE, Plaintiff demands judgment against Defendant for Plaintiff's damages, interest, costs, and such further relief as the Court deems just and equitable.

Submitted by:

Mendez Law Offices, PLLC
Attorneys for Plaintiff
P.O. BOX 228630
Miami, Florida 33172
Telephone: 305.264.9090
Facsimile: 1-305.809.8474
Email:info@mendezlawoffices.com
By: _____/s/_____
DIEGO GERMAN MENDEZ, ESQ.
FL BAR NO.: 52748

Adams & Associates, P.A.
Attorneys for Plaintiff
6500 Cowpen Road, Suite 101
Miami Lakes, FL  33014
Telephone:  786-290-1963
Facsimile:  305-824-3868
Email: radamslaw7@gmail.com
By: _____/s/_____
RICHARD J. ADAMS, ESQ.
FL BAR NO.: 770434